UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN MACIAS,

                Plaintiff,

-against-

BARRIER FREE LIVING, INC.,

                Defendant.

**OPINION AND ORDER**

16 Civ. 1735 (ER)

Ramos, D.J.:

    John Macias ("Macias" or "Plaintiff") brings this action against Barrier Free Living, Inc. ("BFL" or "Defendant") for allegedly unlawful employment practices. Macias alleges that he was subjected to a hostile work environment and was discriminated against on the basis of his sex; ultimately, he alleges that he was fired because he raised complaints about being subjected to harassment in the workplace. Macias brings claims for discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000 *et seq.*, the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq*. *See* Compl. (Doc. 1).

    BFL now moves for summary judgment on all of Macias' claims pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons discussed below, BFL's motion for summary judgment is GRANTED.

## I. BACKGROUND[1]

BFL is a non-profit organization that provides residential and non-residential support services to persons with disabilities. Plaintiff's Rule 56.1 Counter-Statement of Material Facts ("56.1") (Doc. 37) ¶ 2. Paul Feuerstein ("Feuerstein") is the founder, President, and Chief Executive Officer of BFL; Donald Logan ("Logan") is its Chief Operating Officer. *Id.* ¶¶ 3, 5. BFL operates Freedom House, a domestic violence shelter in New York City. *Id.* ¶ 6. Freedom House provides emergency shelter, counseling, and social work services to disabled victims of domestic violence. *Id.* ¶¶ 7, 8. Freedom House employs approximately forty people; most of its employees and residents are women. *Id.* ¶¶ 9–11.

### A. Macias' Hiring and Relationship to his Supervisors

Macias applied to be the facilities manager at Freedom House in the summer of 2012. *Id.* ¶ 18. He was initially interviewed by Logan, Aeilushi Mistry ("Mistry"),[2] and a male facilities manager who worked at a different BFL facility. *Id.* ¶ 19. In a second round of interviews, Macias met Isa Martinez ("Martinez"),[3] Myra Ricard ("Ricard"),[4] Maritza Gomez ("Gomez"),[5] and Josephine Vasquez ("Vasquez").[6] *Id.* ¶ 20. Logan offered Macias the job on July 9, 2012, and Macias began employment with BFL on September 10, 2012. *Id.* ¶¶ 21–22. Macias was considered part of the Freedom House management team. *Id.* He was given an office in the

---

[1] The following facts are drawn from Defendant's Rule 56.1 Statement of Undisputed Material Facts (Doc. 29), Plaintiff's Rule 56.1 Counter-Statement ("56.1") (Doc. 37), Defendant's Reply 56.1 Statement (Doc. 42), and the parties' supporting submissions. For ease of reference, the Court will cite to Plaintiff's Rule 56.1 Counter-Statement, which contains both Defendant's assertions and Plaintiff's responses.

[2] Mistry was the manager of Human Resources for BFL during Macias' employment. *Id.*

[3] Martinez was then the director of Freedom House. *Id.* ¶ 20.

[4] Ricard was, at that time, the director of social services. *Id.* ¶ 20.

[5] Gomez was the resident aide supervisor during Macias' employment. *Id.* ¶ 20.

[6] Vasquez was the director of housing and entitlements. *Id.* ¶ 20.

2

basement of the shelter and a work cell phone because he was expected to be "on call" at all times in case of emergencies. *Id.* ¶¶ 24, 29–30. Macias oversaw the maintenance, security, and cleanliness of Freedom House. *Id.* ¶ 25. He also supervised the maintenance and housekeeping staffs. *Id.* ¶ 26.

When Macias first began working at Freedom House, he reported to Martinez. *Id.* ¶¶ 41, 43. During that period, Macias had several complaints about his treatment. First, staff members at the front desk would make a notation in the logbook when Macias arrived and departed, but they would not track the hours of any other managers. *Id.* ¶ 55. Macias complained about this behavior to Martinez, and it stopped. *Id.* ¶ 56.[7] Second, Martinez occasionally yelled at Macias in the hallway. *Id.* ¶ 59. At one point, when Macias and Martinez had a disagreement over a thermostat, Martinez stated, "Just because you're a man, you're trying to get one over." *Id.* ¶ 47.[8] Macias did not know what Martinez meant by this, but surmised that he was being accused of being overconfident because of his gender. *Id.* On another occasion, Martinez told Macias that she hired him because he was "a good-looking man." *Id.* ¶ 48. Martinez also did not always invite Macias to meetings she had with other Freedom House managers, who were women. *Id.* ¶¶ 60–61. Martinez also tried to fire Macias in late October 2012, when he was unavailable

---

[7] Macias denied this statement, but did not support his denial with any citation to the record. *See* Local Rule 56.1(d) ("Each [56.1] statement by the movant or opponent pursuant to Rule 56.1(a) and (b), *including each statement controverting any statement of material fact*, must be followed by citation to evidence which would be admissible . . . .") (emphasis added). If a party fails to properly controvert a fact in the moving party's 56.1 statement, it is deemed admitted. *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003). Wherever Macias has denied Defendant's statements or added additional facts without citations to admissible evidence in the record, the Court has disregarded the denial and, upon ensuring that BFL's statements are supported by admissible evidence, deemed them admitted. *E.g.*, 56.1 ¶¶ 56, 76, 82–83, 130–34, 138, 143, 146, 149–50, 164–65, 167–70.

Furthermore, in this instance, Macias' denial is directly rebutted by his deposition testimony, in which he stated that after he complained to Martinez, the tracking stopped. *See* Declaration of Melissa Mendoza ("Mendoza Decl.") (Doc. 39) Ex. 1 at 71:25–72:2 ("It took them a few weeks. They stopped. I noticed it stopped.").

[8] It is not clear from the record when this altercation took place.

3

during Superstorm Sandy. *Id.* ¶¶ 66–68. Feuerstein, however, intervened and did not permit Macias to be fired or disciplined. *Id.* ¶ 69.

A few months into his employment (in late 2012), Macias complained to Logan about Martinez. *Id.* ¶ 72. Macias believed that he was the only one Martinez treated so negatively. *Id.* ¶ 73. Macias did not complain to Feuerstein. *Id.* ¶ 75. In the middle of 2013, however, Feuerstein learned from other Freedom House employees that Martinez was a difficult manager. *Id.* ¶ 76. Feuerstein then interviewed several employees who were supervised by Martinez, including Macias. *Id.* ¶ 78. Feuerstein concluded that Martinez's management style was creating conflict and low morale among both male and female employees, and she was terminated on June 17, 2013. *Id.* ¶¶ 81–83.

Beginning in June 2013, Ricard served as the interim director of Freedom House. *Id.* ¶ 84.[9] Nicole Lesser ("Lesser") began working as Freedom House's director on September 9, 2013. *Id.* ¶ 90. Macias found Lesser to be a supportive and fair manager. *Id.* ¶¶ 91–92. Lesser was Macias' supervisor for the duration of his employment.

### B. Macias' Relationship with Resident A and Subsequent Termination

BFL maintains a policy on relationships in the workplace, which prohibits any "personal relationships (i.e. romantic or sexual [in] nature, [or] financial)" between employees and residents. The policy states that employees engaged in personal relationships with residents will face termination. *Id.* ¶ 95. BFL has terminated employees for entering into inappropriate personal relationships with residents in the past. *Id.* ¶¶ 167–69.

---

[9] Macias felt that Ricard did not listen to his concerns as seriously as she listened to women managers at Freedom House. Macias stated that "when the female managers walked in her office, she would shut the door and listen to their complaints. But yet when I walked in, [she said] leave, I'm having lunch." *Id.* ¶ 85.

4

Macias' position at Freedom House did not require him to work directly with residents or to provide services or counseling to residents. *Id.* ¶ 27. Macias was not supposed to give his work cell phone number to residents. *Id.* ¶ 31. In his deposition, Macias agreed that there was no reason for a Freedom House resident to have his personal cell phone number, and that it would be inappropriate for him to provide his personal cell phone number to a resident. *Id.* ¶ 33.

On February 1, 2013, a victim of domestic violence ("Resident A") moved into Freedom House. *Id.* ¶¶ 101–02.[10] On June 13, 2013, BFL received a complaint from another resident ("Resident B") that Macias and Resident A were involved in an "intimate" relationship. *Id.* ¶ 103. Logan and Ricard met with Macias and informed him of the allegations regarding the relationship. *Id.* ¶ 105. Both Macias and Resident A—who was interviewed separately—denied having an inappropriate relationship. *Id.* ¶¶ 104, 107. Macias did, however, inform Logan and Ricard that he had been talking to Resident A. They warned him to stop communicating with her, and reviewed the policy on relationships in the workplace with him; however, BFL did not take further action at that time. *Id.* ¶ 108–10.[11]

The rumors about the relationship, however, continued to circulate, and Macias testified that his colleagues stopped treating him with respect and began harassing him. *Id.* ¶ 112. Other employees made sexual innuendoes about him, and five co-workers asked him if he was having sex with a resident in his office. *Id.* ¶¶ 115–17. Macias believed Gomez was responsible for spreading these rumors. *Id.* ¶ 118. Macias informed Lesser of the rumors, and she listened to him and worked with him on setting boundaries with female residents to avoid rumors. *Id.* ¶¶

---

[10] Resident A stayed at Freedom House until August 1, 2013. *Id.*

[11] On August 9, 2013, Logan wrote in an email to Feuerstein that he had "proof" regarding Macias and Resident A, and that Logan's opinion was that Macias "should be suspended at the minimum and/or terminated altogether." *See* Mendoza Decl. Ex. 22. It is unclear from the record what, if anything, happened as a result of this email.

123–24.  She also asked him to leave the door open when she had meetings with him in his office, so they could avoid rumors.  *Id.* ¶¶ 120–21.

On August 12, 2014, more than a year after Resident A had moved out of Freedom House, Macias sent an email to Lesser requesting a meeting with HR because he felt that "there is constant finger pointing and false allegations towards me and my staff member[s]."  *Id.* ¶ 126.  On August 14, 2014, Macias met with Lesser, Feuerstein, and Mistry.  *Id.* ¶ 127.  Macias explained his belief that he was not respected by certain managers and staff and that there was "gossip" about his relationship with residents.  *Id.* ¶¶ 128–29.  Macias did not specifically say that he was being treated differently because of his sex.  *Id.* ¶ 130.  Feuerstein called an all-staff meeting, and after that, the rumors subsided.  *Id.* ¶¶ 133–35.

Just over a month later, on September 24, 2014, BFL received a voicemail message from Resident B.  *Id.* ¶ 136.  Resident B again claimed that Macias had an inappropriate relationship with Resident A.  *Id.*  Resident B told BFL that she would go to the media about Macias and advised BFL to look at Macias' phone records.  *Id.*  On September 29, 2014, Logan reviewed the phone records from Macias' business cell phone.  *Id.* ¶ 139.  He found that between May 6, 2013 and June 13, 2013, Macias and Resident A called each other 160 times.  *Id.* ¶ 141.[12]  Because of the length of several of the calls, Plaintiff argues that Macias and Resident A attempted to call each other 138 times during this period and actually had phone conversations only 22 times.  *Id.*

---

[12] At some point in 2013, Macias stopped using a separate cell phone for BFL and used his personal phone exclusively.  *Id.* ¶ 142.  According to Logan, Macias stopped using a work cell phone in either June or July 2013.  *See* Declaration of Donald Logan (Doc. 32) ¶ 6.  Macias did not recall when he made this switch, but notes that contemporaneous emails discuss BFL's partial reimbursement of Macias' personal cell phone bills in January 2014.  *See* Mendoza Decl. Exs. 11–12.  These emails refer to cell phone bills beginning in October 2013, and Plaintiff therefore argues that Macias did not switch to the use of his private phone until October 2013.  *See* 56.1 ¶ 142.  BFL did not have access to Macias' personal cell phone records.  *Id.*

Some of these calls were made at night or on weekends. Multiple calls lasted for at least fifteen minutes. *Id.* ¶ 143.

During the pendency of this litigation, Macias admitted that some of the calls with Resident A were maintenance-related, but others were not. *Id.* ¶ 144. Macias also admitted that his relationship with Resident A was inappropriate and stated that the relationship was "personal" and "like a father/daughter type of thing." *Id.* ¶¶ 155–56; 166. In his 56.1 Statement, Macias denies that he called his relationship with Resident A "inappropriate" and says he misspoke. *Id.* ¶ 166. However, in support of his denial, he points generally to what he calls "Macias Dec." *Id.* But Macias has not filed a declaration in this case. Furthermore, Macias did not say that the relationship was inappropriate only once. He was asked why he thought it was inappropriate, and he explained that he knew it was against company policy, but that he didn't see "the big deal" about it. *See* Mendoza Decl. Ex. 1 at 189:18–191:16.

Macias also admitted that he gave Resident A his personal cell phone number, and that he exchanged calls with her on his personal cell phone. *Id.* ¶ 158. Additionally, Macias admitted that he spoke with Resident A until she left Freedom House, and on at least one occasion after that. *Id.* ¶ 164. Macias now denies these assertions as well, but his only support here too is citation to his nonexistent declaration. *Id.* Furthermore, Macias' deposition testimony on this point is clear. When asked if he continued having phone calls with Resident A until the day she left Freedom House, Macias replied, "Yes, yes." *See* Mendoza Decl. Ex. 1 at 223:25–224:4. When asked if that included calls after he was warned about the relationship and told to stop, Macias replied, "Right." *Id.* at 224:5–11. When asked if he had calls with Resident A on his personal cell phone, he replied "Yes, yes." *Id.* at 224:17–19. When asked if he gave Resident A his personal cell phone number, he replied "Yes, yes." *Id.* at 224:20–22.

7

On September 29, 2014, after reviewing the phone records, Logan emailed his findings to Feuerstein, Ricard, and Mistry. *See* Logan Decl. ¶ 21; *id.* Ex. B. The next day, Feuerstein, accompanied by Gomez, met with Macias. *Id.* ¶ 147. Feuerstein informed him that BFL had discovered the volume of phone calls between him and Resident A, and terminated his employment. *Id.*; Mendoza Decl. Ex. 31. The official reason for termination listed for Macias was "performance." *Id.* ¶ 151. Feuerstein also gave Macias a termination memo, which stated that Macias' termination was the result of his contact with Resident A because that contact "constitute[d] a violation of our standards of practice." *Id.* ¶ 153. After Macias was terminated, BFL hired another man to serve as the Freedom House facilities manager. *Id.* ¶ 154.

On March 7, 2016, Macias brought the instant complaint against BFL. *See* Compl. (Doc. 1). On June 1, 2017, BFL moved for summary judgment on all claims. *See* Doc. 28.

## II. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it might affect the outcome of the litigation under the governing law. *Id.* The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.*, 706 F.

Supp. 2d 494, 504 (S.D.N.Y. 2010) (citing *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (internal quotation marks omitted)).

In deciding a motion for summary judgment, the Court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'" *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986)).

Courts are cautious in granting summary judgment in employment discrimination cases where the employer's intent is at issue. *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008). However, "[s]ummary judgment is appropriate even in discrimination cases, for . . . the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials— apply no less to discrimination cases than to other areas of litigation." *Hongyan Lu v. Chase Inv. Servs. Corp.*, 412 F. App'x 413, 415 (2d Cir. 2011) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000)). Indeed, "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004) (quoting *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001)). Furthermore, "[e]ven in the discrimination context . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb*,

521 F.3d at 137. A "nonmoving party 'must offer some hard evidence showing that its version of the events is not wholly fanciful.'" *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998)).

## III. DISCUSSION

### A. Discriminatory Termination

Discrimination claims brought under Title VII are analyzed under the familiar *McDonnell Douglas* burden-shifting framework. A plaintiff must first establish a *prima facie* case of discrimination. In the context of a discriminatory termination, a plaintiff must show that: "(1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination." *Ruiz v. County of Rockland*, 609 F.3d 486, 492 (2d Cir. 2010). Once the plaintiff meets his initial burden, the burden shifts to the defendant to offer a legitimate, nondiscriminatory reason for the termination. *Id.* If the defendant does so, the burden shifts once again, and the plaintiff must show that the real reason for his termination was discrimination. *Id.*

BFL does not contest that Macias was a man, was qualified for his job and was terminated; the only issue is whether the circumstances of his termination gave rise to an inference of sex discrimination. *See* Memorandum of Law in Support of Defendant's Motion to Dismiss ("Def.'s Mem.") (Doc. 30), at 11. BFL argues that Macias has presented no evidence that could give rise to an inference that the decision makers involved in his termination were biased against him because of his sex. *Id.* BFL argues that Feuerstein alone made the decision

to terminate Macias' employment; Macias makes the unsupported assertion that Logan and a man named Jack Fritts were also involved. 56.1 ¶ 149.[13]

Even assuming all three men were involved in the decision to terminate Macias, Plaintiff has put forward no evidence that any of the three decision makers made derogatory comments about men or evinced any kind of bias against men. The fact that all three decision makers were members of Plaintiff's protected class, and that the next facilities manager they hired was also a man, severely undercuts Macias' ability to raise a *prima facie* inference of discrimination. *See Inguanzo v. Hous. & Servs., Inc.*, No. 12 Civ. 8212 (ER), 2014 WL 4678254, at *18 (S.D.N.Y. Sep. 19, 2014) (collecting cases finding that an inference of discrimination is weakened when the decision maker is a member of the same protected class), *aff'd* 621 F. App'x 91 (2d Cir. 2015); *Fleming v. MaxMara USA, Inc.*, 644 F. Supp. 2d 247, 261 (E.D.N.Y 2009) ("Where a member of the plaintiff's protected class is contemporaneously hired as a replacement, the offering of proof of intentional discrimination appears extremely difficult, if not practically impossible.") (internal quotations omitted), *aff'd* 371 F. App'x 115 (2d Cir. 2010).

In opposition, Macias points to ill-advised comments made and actions taken by Martinez. Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Mem.") (Doc. 38) at 14. But Martinez was terminated in June 2013—over a year before Macias was terminated. Therefore, her actions cannot give rise to an inference that Macias' 2014 termination was motivated by sex-based discrimination. *Inguanzo*, 2014 WL 4678254, at *16 ("[S]tray comments are not evidence of discrimination if they are not temporally linked to an adverse employment action or if they are made by individuals without decision-making authority.").

---

[13] Neither party has explained Mr. Fritts' connection, if any, to this case.

Macias also argues that he was treated differently than the female managers at BFL. He states that while he was terminated because of rumors that he had an inappropriate relationship with a resident—an inappropriate relationship that he acknowledged under oath—female managers were not punished for spreading rumors about Macias' relationships with residents. Pl.'s Mem. at 14.[14] In essence, Macias is saying that the female managers should have faced the same punishment he did—i.e., termination—for merely discussing his flagrant violation of a BFL policy that touches upon the wellbeing of BFL's vulnerable residents. This argument is absurd. Even assuming that some of the rumors were false, a plaintiff arguing differential treatment must show that he and his co-employees were subject to the same disciplinary standards and engaged in conduct of comparable seriousness. *Graham v. Long Island R.R.*, 230 F.2d 34, 39–40 (2d Cir. 2000). Spreading rumors about a colleague is not "comparably serious" to engaging in a prohibited personal relationship with a resident. In contrast, those employees that did violate BFL's policies regarding relationships with residents were treated in the same manner as Macias—their employment was terminated. *See* 56.1 ¶¶ 167–69.[15]

Macias also devotes a significant portion of his opposition to arguing that he should not have been terminated for the personal relationship he maintained with Resident A. He argues that he did not have a sexual or romantic relationship with any residents and therefore did not run afoul of BFL's policy. Pl.'s Mem. at 12 (citing Mendoza Decl. Ex. 20). He argues that "being friendly" does not constitute a personal relationship because BFL knew that he had spoken with

---

[14] Separately, Macias also complains that he was reported for going to a barber near Freedom House, while female managers "could get their nails done nearby." Pl.'s Mem. at 14. But Macias admits that this incident occurred after his termination and that he was not disciplined. *See* 56.1 ¶ 114; Mendoza Decl. Ex 1 at 124:17–22.

[15] Plaintiff asserts, without support, that "if not for being male, the phone calls would likely not have caused the immediate and unfounded decision to fire Macias." Pl.'s Mem. at 15. But this assertion is belied by the evidence that when two women violated this policy by entering into financial relationships with residents, they *were* terminated. *See* 56.1 ¶ 168.

Resident A in June 2013, and at that point he was only asked to stop his behavior. *Id.* Macias argues that he was simply befriending a female resident who "needed a friend in such a difficult point in [her life]." *Id.* at 14. Whether or not Macias agrees with BFL's policy prohibiting "any personal relationship" between employees and residents is of no moment. Whether or not Macias believes the policy was incorrectly applied is similarly unpersuasive. Courts do not act as "super-personnel departments." *Dabney v. Christmas Tree Shops*, 958 F. Supp. 2d 439, 454 (S.D.N.Y. 2013) (quoting *Ghent v. Moore*, 324 F. App'x 55, 57 (2d Cir. 2009)). Even if a jury completely credited Macias' account of his relationship with Resident A and agreed that BFL's policy should only apply to sexual relationships, that does not demonstrate that Macias' termination was the result of discriminatory intent. *See Guzman v. City of New York*, 93 F. Supp. 3d 248, 264 (S.D.N.Y. 2015) ("Whether these beliefs were accurate is beside the point; Guzman has offered no evidence indicating that they were not honestly held."). Macias, therefore, has not met the minimal burden of establishing a *prima facie* case of discrimination, and summary judgment is GRANTED with respect to his claims for discriminatory termination under Title VII.[16]

### B. Retaliation Claims

Macias also claims that his termination was the result of unlawful retaliation. To establish a *prima facie* showing of retaliation, a plaintiff must show that: "(1) []he engaged in protected activity; (2) the employer was aware of that activity; (3) the plaintiff suffered a

---

[16] To be sure, even if the foregoing facts can be construed to have established a *prima facie* case, the claim would still be dismissed because it cannot survive the balance of the *McDonnell Douglas* framework. BFL offers a "legitimate, nondiscriminatory reason" for Macias' termination—specifically, BFL uncovered evidence that Macias violated workplace policies. *See Spiess v. Xerox Corp.*, 481 F. App'x 700, 701 (2d Cir. 2012) (finding that the defendant "articulated a legitimate, nondiscriminatory reason" for termination by pointing to a violation of workplace policies). For the same reasons the Court finds that Macias cannot make a *prima facie* showing, the Court finds that he could not establish that BFL's reason for termination was simply pretext for its discriminatory intent. *See Ruiz*, 609 F.3d at 492 (setting forth the *McDonnell Douglas* framework).

13

materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Guzman*, 93 F. Supp. 3d at 261 (citing *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010)).

To show protected activity, Macias stated that he complained "weekly" that he and his staff "were being treated unfairly." Pl.'s Mem. at 19. Macias also points to his August 2014 meeting with Feuerstein, Lesser, and Mistry, in which he shared his belief that Gomez started the rumors about his inappropriate relationships with residents. Macias adds that Gomez was not disciplined and was present at his termination meeting, which he argues "leads to more questions of facts regarding whether [he] suffered retaliation for reporting Gomez." Pl.'s Mem. at 19–20.

While complaints about unfair treatment can constitute protected activity, the speaker must "clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class." *Aspilaire v. Wyeth Pharms. Ins.*, 612 F. Supp. 2d 289, 308 (S.D.N.Y. 2009). Even where a plaintiff has used words like "discrimination" and "harassment" in making a complaint, the complaint does not constitute protected activity if "nothing in the substance of the complaint suggests that the complained-of activity is, in fact, unlawfully discriminatory." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 17 (2d Cir. 2013). Here, Macias has only alleged that he complained that he was treated unfairly and that Gomez was spreading rumors about him. These general statements do not support an inference that BFL would have understood Macias to be complaining about unlawful discrimination on the basis of his sex. *See id.* at 13 (affirming dismissal of complaint where the plaintiff alleged, in part, that after she complained about another employee's poor behavior, the employee was not disciplined); *see also Brown v. Henderson*, 257 F.3d 246, 256 (2d Cir. 2001) (explaining the

14

difference between "sexual harassment" and "behavior [that] touched on matters of sexuality").
The Court therefore GRANTS Defendant's motion for summary judgment on retaliation.

    **C.**    **Hostile Work Environment**

Under Title VII, it is unlawful for an employer to discriminate against an employee with respect to the "terms, conditions, or privileges of employment, because of such individual's . . . sex." *See* 42 U.S.C. § 2000e-2(a)(1). Under this provision, an employee may bring a claim if they are made to work in a "discriminatory, hostile, or abusive environment." *Gallo v. Alitalia-Linee Aeree Italiane-Societa per Azioni*, 585 F. Supp. 2d 520, 535 (S.D.N.Y. 2008) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986)). Hostile work environment claims are also analyzed under the *McDonnell Douglas* standard. *See Chick v. County of Suffolk*, 546 F. App'x 58, 59 (2d Cir. 2013). To meet a *prima facie* burden, a plaintiff must show: "(1) that [his] workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Id.* (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)).

To determine whether a work environment is hostile, courts look at the totality of the circumstances and consider: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) 'whether it unreasonably interferes with an employee's work performance.'" *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). Title VII is not a "general civility code," and Macias must establish that the conduct was the result of discrimination on the basis of sex. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). Further, the incidents constituting the alleged discrimination must be "repeated and

15

continuous" rather than "isolated" or "occasional."  *Davis-Bell v. Columbia Univ.,* 851 F. Supp. 2d 650, 673 (S.D.N.Y. 2012) (quoting *Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 62 (2d Cir. 1992)).

Here, Macias argues that he has established a *prima facie* showing of hostile work environment discrimination because he was "left out of important meetings, yelled at in the halls, logged in and out of the logbook when he went to the bathroom, forced to keep his office door open, falsely accused of having sexual relations with residents and having sexual relations in his office, [and] disregarded when making legitimate complaints about his mistreated and 'unhealthy work environment.'"  Pl.'s Mem. at 17.

First, several of these incidents—specifically, the meetings, the incidents of yelling, and the logbook tracking—occurred only during Martinez's tenure.  *Id*. at 4–5.  Plaintiff presents no evidence to show that he continued to be tracked, yelled at, or left out of meetings after Martinez was fired.  *See Mathirampuzha v. Potter*, 548 F.3d 70, 79 (2d Cir. 2008) ("[Defendant's] response to the incident, . . . while not immediate, ultimately ameliorated the plaintiff's working conditions, as [the supervisor] was eventually disciplined . . . .").  Moreover, Macias admitted that when he raised concerns about being tracked in the logbook during Martinez's tenure, the behavior stopped.  *See* 56.1 ¶ 56.

The Court finds that the remaining three allegations—being asked to keep his door open during one-on-one meetings, being the subject of rumors, and not being listened to—are unrelated to Macias' sex and were not sufficiently severe or pervasive to alter the conditions of his employment.  *See Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 119 (2d Cir. 2010) ("[Plaintiff's] other allegations are generally quite minor—she alleges that defendants wrongly excluded her from meetings, excessively criticized her work . . . and sent rude emails to her.

These incidents do not support a finding of a hostile work environment that is pervasive or severe."); *see also Nunez v. N.Y.S. Dep't of Corr. & Cmty. Supervision*, No. 14 Civ. 6647 (JMF), 2015 WL 4605684, at *14 (S.D.N.Y. July 31, 2015) (finding that gossip about the plaintiff did not "rise above 'the sorts of petty slights and personality conflicts that are not actionable' under Title VII and the NYSHRL") (quoting *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 571 (2d Cir. 2011)). Therefore, the Court finds that Macias has not met his *prima facie* burden of showing a hostile work environment, and GRANTS Defendant's motion for summary judgment. *Cf. Tepperwien*, 663 F.3d at 572 ("Taken in the aggregate, the actions still did not adversely affect [the plaintiff] in any material way. Zero plus zero is zero.") (internal quotations omitted).

## IV.    PLAINTIFF'S STATE AND CITY CLAIMS

Plaintiff also raises claims for discrimination and retaliation under the NYHRL and NYCHRL. *See* Compl. (Doc. 1) (Claims 3, 4, 6, and 7). Summary judgment is also granted with respect to those claims for the same reasons that Plaintiff's Title VII claims fail as a matter of law. *See Gutierrez v. City of New York*, 756 F. Supp. 2d 491, 502 (S.D.N.Y. 2010) ("Claims of employment discrimination under the NYSHRL proceed under the same analysis as Title VII.") (citing *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir. 1998)). The NYCHRL is evaluated under a more liberal standard than the NYSHRL or Title VII. *See Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009). However, even under the NYCHRL, Macias' claims fail because he has not shown that any of the complained-of conduct was the result of discrimination on the basis of sex. *See Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) ("[D]istrict courts must be mindful that the NYCHRL is not a general civility code. The plaintiff still bears the burden of showing that the

17

conduct is caused by a discriminatory motive. It is not enough that a plaintiff has an overbearing or obnoxious boss. She must show that she has been treated less well at least in part *because of her gender.*") (internal citations and quotations omitted); *see also Mayers v. Emigrant Bancorp, Inc.*, 796 F. Supp. 2d 434, 450 n.22 (S.D.N.Y. 2011) ("[R]etaliation claims under the NYCHRL, like the NYSHRL, require the employer's awareness of the protected activity.").

Plaintiff has raised four remaining claims: aiding and abetting discrimination (Claims 5 and 8), supervisory liability (Claim 9), and interference with protected rights (Claim 10). Because the Court finds that Plaintiff has not suffered unlawful discrimination or retaliation under state or city ordinances, claims for supervisory liability and aiding and abetting discrimination should also be dismissed. *See Sowemimo v. D.A.O.R. Sec., Inc.*, 43 F. Supp. 2d 477, 490 (S.D.N.Y. 1999) ("[L]iability under the [NYS]HRL and NYCHRL must first be established as to the employer/principal before an individual may be considered an aider and abetter."); *Woldeselassie v. American Eagle Airlines/American Airlines*, No. 12 Civ. 7703 (LGS), 2015 WL 456679, at *12 (S.D.N.Y. Feb. 2, 2015) ("[W]hile the NYSHRL and NYHRL do establish supervisory liability for discriminatory conduct, Plaintiff has failed to show any discriminatory conduct in the first place.").

Finally, with respect to Macias' claim for interference with protected rights, Macias does not explain, in either his Complaint or his opposition, how BFL "coerce[d], intimidate[d], threaten[ed] or interfere[d] with" his rights under the NYCHRL. *See* N.Y.C. Admin. Code § 8-107(19). To establish interference, a plaintiff must show that a threat was made against him because of his exercise of a protected right. *Nieblas-Love v. New York City Hous. Auth.*, 165 F. Supp. 3d 51, 78 (S.D.N.Y. 2016). The only threat against Macias mentioned in the record is Martinez's fall 2012 attempt to fire Macias because he was unavailable during Superstorm

Sandy. *See* 56.1 ¶¶ 66–68, 80. Macias has not even attempted to explain how his unavailability during that storm constituted an exercise of his rights under the NYCHRL. Therefore, this claim, too, must be dismissed.

## V. CONCLUSION

Defendant's motion for summary judgment is hereby GRANTED. The Clerk of the Court is respectfully directed to terminate the motion, Doc. 28, and close the case.

It is SO ORDERED.

Dated:    March 27, 2018
           New York, New York

                                                                                      _____
                                                                                     Edgardo Ramos, U.S.D.J.